The opinion of the Court was delivered by
Wardlaw, J.
The will of Gen. Davie contains the following clause:—
“Item. I give and devise all the rest and residue of my lands and real estate in the State of South Carolina, to my son Frederick William Davie, to him and his heirs forever, *544 subject however to the incumbrances mentioned in his will:— and it is my will, and I do hereby devise, that in case of the death of my said son Frederick William, without issue male living at the time of his death, then, in that case, I give and devise the lands and real estate, (so devised as above to the said Frederick William,) to his brother Hyder Ally Davie, to him and his heirs forever; subject however to the incumbrances in this will mentioned.
■ And in case the said Hyder Ally Davie shall die without issue male living at the time of his death, then, in that case, I give and deVise the said lands and real estate to the eldest issue male of my son Allen Jones Davie, then living when such event shall take place, that is, of the sons he may have living at my death, to him and his heirs forever, subject to the incumbrances directed in this will.
And should my said son Frederick William have issue male, and such issue male of my said son Frederick William, should or shall die without issue male living at the time of his death, then, in jdiat case, it is my will, 'and I do devise, the lands and real estate so devised and described above, first to my son Hyder Ally Davie and his heirs, and then to the eldest issue male, living at the time, of Allen Jones Davie, under the same limitations and on the same contingencies, and in the same order and manner (as above directed and devised should my son Frederick William die without any issue male living at the time of his death,) to them, and their heirs forever:
And should my son Hyder Ally Davie, have issue male living at his death, (have issue male living at his death, [repeated],) and such issue male shall die without leaving issue male living at His death, then, in that case, I give and devise the said lands and real estate so described and devised above, (should they so have vested under the above contingencies in such issue male,) to the eldest issue male then living of my son Allen Jones Davie, being of his sons living at my death, to him, his heirs, and assigns forever.”
*545 There are in the original will no marks for parentheses, nor words in italics or capitals, nor even ordinary marks for punctuation.
The plaintiffs in this case are devisees under the will of Hyder A. Davie the defendant is a tenant under William R. Davie, son of Allen Jones Davie. The case submitted by the special verdict is resolved into the question, whether grandsons of Hyder A. Davie, living at his death and being children of his daughter Mrs. Bedon, come within the terms issue male in this part of the clause, “and in case the said Hyder Ally Davie shall die loithout issue male living at the time of his death.” Did Hyder A. Davie die without issue male living at the time of his death? In the true sense of the will, did a grandson through a daughter constitute issue male, or was there required either a male through males, or a son, — male issue in first degree ?
The special verdict finds the whole will, the condition of the testator’s family at the date of the will and at his death, and the fact that the testator was a distinguished lawyer, who had formerly practised in the State of North Carolina. The question submitted must then be decided by the Court from the will' itself, with such aid as these extraneous circumstances may afford.
In various other clauses of the will the word issue' occurs in connexion with female slaves bequeathed, and from the words “farther,” “other,” “more,” which are sometimes joined to it, it has been argued that the testator has in those clauses shown that he used issue to mean children, and that, in the part of a clause particularly important in this case, the word issue should be construed according to the exposition elsewhere given of it. But in the strongest of these instances that can be selected, this inferential exposition is, at the most, doubtful. The-testator, when he drew his will, did not probably contemplate any descendants of slaves bequeathed besides immediate progeny: but it is not at all plain that if he had lived for the happening *546 of the ease, his will would not have shown his desire for the grand-children of a female slave, who with her farther issue was bequeathed, to pass under the word issue wherever their mother would pass.
To the clause above recited we may then confine our attention.
Issue, when used as a word of limitation is equivalent to heirs of the body ; and issue male so used, like heirs male of the body, defines an estate, which, according to the rules of inheritance well settled in England, can descend only to males whose descent from the proposed ancestor has been wholly through males, (a) But where issue is not used as a word of limitation, its natural and primary meaning, without explanation, is descendants in every degree, whether heirs or not; and, in like case, the like meaning of issue male is, descendants that are males. Those who, in the construction of a will, would depart from the primary and natural meaning of the terms, must show how a different meaning is fixed by explanations which are furnished by the will itself taken in connexion with the circumstances under which it was made.(b) That task the defendant here assumes.
First. It is said that the testator was a lawyer who had practised' in North Carolina, where fees-tail might have been implied : — had a general jmrpose to establish the succession to his Landsford estate in his male descendants, who bore his name: — by his constant use of the terms issue male instead of male issue, has shown that his thoughts were turned to the effect of those words in limitations of estates: — by speaking in the latter part of .the clause above recited, of the case of the lands having “ vested under the above contingencies in such issue male,” has shown at least an expectation that such issue male, if left living, would in some way obtain the lands: — and *547 in general, in other parts of the clause, has indicated his intention that none but males through males should take, which intention should avail to explain issue male in the part immediately affecting this case.
These propositions thus connected, contain some matters which should not be brought into the discussion, some which are really adverse to the conclusion that the defendant would deduce from them, and some which may raise doubts but cannot afford the explanation demanded. We will examine them, intending hereafter to particularize, and subject to a separate analysis, each of the most material of the other parts of the clause that are referred to in the last proposition.
As to the law of North Carolina, as to any preference felt by the testator for males who bore his name, and, as to any intention or purpose entertained by him and not expressed in his will, the special verdict is silent. Evidence could not have been admitted to show intention as an independent fact — for, however influential intention when ascertained may be in the construction of a will, it must be sought in the will itself, with the aid of such circumstances as explain the meaning of the words there used.(a)
That the testator was a lawyer can be no reason why technical terms belonging to his profession should have a signification different from that, which technically is proper for them when they are used as he used them. Even if by habit, or tacit reference to some peculiar code, he may be supposed to have used ordinary terms of art in some peculiar sense, of which the will properly expounded gives no interpretation, the terms, being in their ordinary meaning sensible in their application to extrinsic circumstances, could not acquire a peculiar meaning from any force of external evidence.(b)
It is admitted on both sides that the testator’s real intention was to create successive fees simple in his sons Frederick Wil *548 liam, and Iiyder Ally, subject to defeasance upon contingencies; —which contingencies relate to the issue male of these sons, but give nothing in any event to such issue. This is the obvious result of the words “to him and his heirs forever,” industriously used, and in all probability well understood by the testator. With this, (if we suppose that the. testator expected these sons respectively to keep the estate as he had done and to devise to one of their- male issue, if they left any,) may consist the equivocal expression, “ should they (the lands) so have vested under the above contingencies in such issue male.” It would be pushing construction very far, if without strong necessity raised by all thé words in their application to external things, the plain expressions of one estate should be made to yield to the implication of a different one. But still, after all this, there seems to lurk in the propositions of the defendant, an insinuation that General Davie really intended the issue male of each of his sons, in certain contingencies, to take in some way by force of the will; and that this intention affords some explanation of the sense fie ascribed to issue male. Let us see what estate the issue could have been intended to take; and what assistance any conceivable estate can give to the defendant.
If, in any contingency, issue of Frederick William or Hyder could have taken by force of this will, they must have taken as purchasers or as heirs. If they were intended to take as purchasers, the same question, which now employs us, would have arisen concerning the meaning of issue male: all male descendants would have been included, if some restrictive meaning did not arise from the context. For instance, if the devise had been construed to be to Frederick William for life, with remain- , der in fee to his issue male living, at his death, and in default of such issue male then living, executory devise to Hyder for life, with remainder in fee to his issue male, &c.; a grandson of Frederick William, or of Hyder, would have taken along with *549 a son, and a grandson through a daughter would have answered the description as well as one through a son, if a contrary intention did not appear.(a) No aid would be received by the defendant from this view.
If the issue male of Frederick William or Hyder were intended to take as heirs per formam'doni, then the estate limited to their ancestors must have been a fee-tail or a fee-conditional at the common law. No fee-tail could ever have been created in this State. If a testator has used the words most apposite elsewhere for creating one, he has here only done what the common law before the enactment of the Statute de donis, permitted : that is he has created a fee conditional: and no other intention can be imputed to him.
If the will can be supposed to have given a fee conditional to Frederick William and his heirs male, and upon failure of his heirs male to Hyder, &c., the succession in the first instance would have been to Frederick William’s issue male in the strict male line, — males through males. But it must be remembered that there can be'no remainder after á fee, nor any executory devise upon the contingency of a general failure of issue male. The consequence would have' been that neither Hyder nor Allen’s issue would have taken any thing by the will: — upon Frederick William’s death without leaving issue male, the possibility of reverter, which remained in the grantor of the fee conditional, would have become an estate in the testator's heirs general: neither of the parties now before the Court would be entitled to all of the lands in question, but the defendant in this case, for defect'of the plaintiff’s title, would prevail.(b)
If, by a proper construction of the will, it should appear that there was a fee conditional in Frederick William and his heirs male, subject to the contingency of a failure of his heirs male *550 at his death, (and according to opinions held by at least four members of the Court of Errors in Buist vs. Dawes, 4 Rich. Eq. 496, it should be resolved, that upon such a contingency there might be a limitation upon a fee conditional, as there' may be upon a fee simple,) then upon Frederick William’s death, the estate passed in fee conditional to Iiyder and his heirs male, and upon Hyder’s death, without issue male through males then living, it passed to the person designated in the limitation, to Allen’s issue, if that limitation was good.
If an estate in fee conditional was given to Frederick William, he might have aliened or encumbered the lands even before the birth of a son, and his alienation or incumbrance woujd have been effective during the continuance of his issue male through males subsequently born ;(a) his alienation, made after the birth of a son, would have' forever barred his issue male ;(b) and, if any such issue had been living at his death, the alienation would have been indefeasible by an executory devise made to depend upon the contingency of his dying without issue male Jiving at his death. The same may be said of Hyder’s power over the estate, if afee conditional had devolved upon him after Frederick William’s death without issue then living.
The case with which, upon very probable occurrences, intentions favorable to the issue might have .been defeated, detracts much from the argument of a desire to keep the lands in the hands of descendants who bore the testator’s name, which has been drawn from the supposition of his intention to create a fee conditional: but this supposition gives to issue male the interpretation which the terms always receive when they are used as words of limitation, that is, males through males.
It is not, however, admissible for us to make this supposition. In England, a devise such as the one before us, would probably be held to create successive estates tail: for there the estate tail is a particular estate, which will support a remainder, and *551 to promote the apparent intention in favor of issue, when a limitation is made in default of issue, an estate tail is frequently implied, notwithstanding express words defining a fee simple. But nothing on this subject is with us (more clearly settled, than that a fee conditional will not be implied, without necessity, or in opposition to expression, if it will be implied at all :(a) and that in cases like this, a fee simple, subject to defeasance upon contingency, shall subsist as expressed, because more likely to effect the intention than a fee conditional. This being so, it is conceded that here were fees simple mounted on fees simple. How then can we say that .the intention was not to create a fee simple, but first assuming that there was an intention to create a fee conditional, contrary to what' we decide, argue from that assumed intention the meaning of a word employed in a contingency annexed to what we hold to be a fee simple? It would not do to conjecture, or what is the same thing, from extrinsic testimony to establish an intention consistent with our decision, and thence infer a meaning different from the natural sense of words employed. Much less can we conjecture an intention, thence infer a meaning, and then reject the intention. This is not the same as taking the exposition of a word from a part" of the will which is inoperative for any other purpose, as from a vain attempt to create a perpetuity. In making such an attempt the testator might give an explanation of a word used in another part of the will, which explanation might, in the construction of the will as a whole, avail to control the natural meaning of the word. There the intention would be frustrated, but the explanation would stand independent of it. But here, to derive any aid from the supposition of a fee conditional, an intention to create such a fee must be imputed to the testator, — the meaning of issue male be taken as if those terms had been used in the limitation of a fee conditional, and then that meaning be carried to the inter *552 pretation of the contingency, when it is acknowledged that the intention was to create a fee simple subject to a contingency.
Issue male used in the part of the clause immediately under consideration, (“ and in case the said Hyder Ally Davie shall die without issue male living at the time of his death,”) defined no persons or class that were to take by inheritance, but designated persons, of whom the non-existence of any at a particular time, should defeat the fee simple before given to Hyder. The primary and natural meaning of the terms is just as applicable as it would have been in case of an estate given to issue male as purchasers. Hyder’s estate, transmissible at his death if the contingency did not happen, was in fee, as Frederick William’s had been. If Frederick William had left a son living at his death, an alienation by himself, or a forced sale by creditors, would have been indefeasible: he might by his will have given the whole estate to a daughter or to a stranger: in case of his dying intestate, leaving the one son, nine daughters, a grandson through a predeceased daughter, and a granddaughter through a predeceased son, it is conceded that the estate wmuld have been divided into twelve parts, and one assigned to each of these his heirs ; or if he had left a son and a widow, the mother of that son, and the son had immediately afterwards died, it is conceded that the whole estate would have passed to the widow. All this, which has been said of Frederick William’s estate, wmuld have been also equally applicable to Hyder’s, if Frederick William dying without issue had been survived by Hyder, and Hyder’s estate was subject to no contingency besides that of his dying without leaving issue male living at his death. There was another contingency, of which we will speak hereafter, but that has not happened yet, if Hyder’s grandsons now living are his issue male, and cannot now affect a fee simple transmitted by Hyder, whatever may hereafter in certain events be its influence. If Hyder had left a son, the estate might, by force of his acts, have passed out of the family of General Davie’s descendants, at least until the *553 happening of the last-mentioned contingency, and until then, if not otherwise disposed of, would have descended to his heirs general. If under the prescribed contingencies the lands should have come to any descendant of Allen, that person would have had an absolute estate' in fee, might have sold or devised at pleasure, and dying would have been succeeded by heirs female no less than by heirs male.
The disposition which the testator made, raised so many chances of defeating any wish to keep the lands in the hands of those who bore his name, or even in the hands of his male descendants, that no such wish can plainly appear from what he has done. He chose to give his lands to his sons rather than to his daughters. To answer why, is much more difficult than to ask why he took his sons in succession rather than in common; why he preferred the third to the others; and why he gave to the descendants of Allen rather than to Allen himself. He did with his own as he pleased. We can know his motives and purposes only from his expressions. He gave estates in fee simple by words too plain for interpretation: he made them subject to contingencies, and in those contingencies occur the terms issue male. There is in the condition of his family and surrounding circumstances nothing to control the natural meaning of these terms, or to show a meaning inconsistent with the natural -meaning, and consistent with every state of events that may be imagined to have occurred. This will then must receive a construction according to established rules, such as another will in like words, controlled by no surrounding circumstances, would receive. We must not allow conjecture and plausible imputation of motive, to serve in lieu of explanation. If we do, there will be no safety in relying upon principles or precedents in the construction of wills, but the opinion of the Court must be invoked, to settle, not what a testator has written, but what a fertile invention may suggest he most probably intended to write.
*554 Second. We will now, confining ourselves to the context apart from all extrinsic circumstances, examine the other parts of the clause recited in the beginning,' which have been sup-supposed to contain indications of intention explanatory of the sense in which the terms issue male were used.
. It is said that there is a difference between the contingencies to which Frederick William’s fee simple was made subject, and those to which Hyder’s were make subject; that in the contingencies first provided as to both, the terms male issue mean only issue in the first degree — sons ; that in the subsequent contingencies more remote issue- is designated by the phrase issue male of issue male: and that from this it appears, that unless Hyder left a son or issue male through an unbroken line of males, his estate has been defeated. ■ '
Turn to the clause. There are four contingencies after the direct devise of a fee simple to Frederick William: first, Frederick William’s death without male issue then living, upon the happening of which the fee shall pass to Hyder. Second, Hyder’s death without male issue then living, upon the happening of which it shall pass to certain male issue of Allen. Third, (recurring to Frederick William) the death of male issue which Frederick William might have, without issue male living at the time of Ms death, upon the happening of which the estate shall pas's to Hyder. Fourth, (recurring to Hyder) the death of issue male which Hyder may have left living at Ms death, without such issue male leaving issue male living at Ms death, upon the happening of which, the estate shall pass to certain issue male of Allen.
Our inquiry now relates directly to the second contingency, and if it be true that) in that issue male means son, Hyder’s estate has been defeated, for he left no son. Whilst urging this meaning, the defendant seems, however, to admit that if Hyder had left a grandson, the son of a predeceased son, the contingency would not have happened drawing an argument from the first and third contingencies, he.strives for the con *555 elusion that in the second, issue male means issue male through males. It is important to observe that the first contingency which is in respect to Frederick William, is in words identical with -the second, which is in respect to Hyder, and that issue male must have the same meaning in both.
If the first had been the only contingency that related to Frederick William, and Frederick William had left at his death no son, but had left the son of a son, can any one believe that the intention of the testator would have been promoted by restricting the natural meaning of issue male to the narrow sense of son of sons, so as in that case to have defeated Frederick William’s fee ? This incredible result of the first contingency, under the construction which confines the sense of male issue there used to immediate descendants, it is said is prevented by the third contingency: it is supposed that that third can serve no other purpose, and that its introduction shows the propriety of this construction. The first contingency thus construed is, if he should die without a son living at his death. The third construed is, if he should Have a son, and such son should die ■without issue male living at his [F. W’s) death, then F. W’s estate shall be defeated. But under neither of these contingencies thus construed would the estate of Frederick William have been without implication saved from defeat, in the case of a deceased son’s son left living at F, W’s death. The corollary to the third, it is said, however is, if such son shall not die without issue male the estate shall not be defeated. The third contingency then is not an additional contingency, upon the happening of which there may be defeasance ; but it is an enlargement of the bar as it has been phrased, an exception to to the general rule — without a son — contained in the first; an exception, which, according to its letter, is a partial re-affirmation, not an exception, but which acquires restrictive effect by inference : — an exception, the need of which has been produced by changing the natural sense of the terms in which the rule was expressed. Suppose that a son dying in Frederick William’s *556 lifetime should have left a grandson in the strict male line, would that case have come within the exception, so that the estate would have been saved from defeasance? Those say it would, who contend that issue male in the first and second contingencies means only immediate descendants. The same words, issue male, used in the same member of the sentence containing the third contingency, (“ such issue male * * die without issue male,”) must thén have two meanings. Much more reasonable than all this, it is to suppose that the testator whenever he used the words issue male and son, (and he used both of them in every one of the four contingencies,) knew the difference of meaning betweeen them, and attributed to each its proper meaning. If he did mean to include all generations under issue, then whether by male he meant only to designate the sex, or meant also to require descent from the ancestor wholly through males, any issue male left by Frederick William living at his death, would have prevented the happening of either the first or the third contingency, according to the construction which makes his in the third refer to Frederick William. Without issue male necessarily includes without issue male of issue male, under either sense of male applied to issue, if the latter be uniformly used to denote all descendants. Was, then, the third contingency a mere repetition in part of the first ? Was all the labored.phraseology (“then and in that case * * under the same limitations, and on the same contingencies, and in the same order and manner, as above, directed and devised, [in case] my son Frederick William should die without any issue male living at the time of his death,”) mere idle tautology, which provided the same, result for the second case as had already been provided for the first, when the first included the second ? No. Plainly there was an intention to provide for a new case: — to add another contingency, upon the happening of which the estate might be defeated. It would be preposterous to suppose that the new case was the death of an individual of issue male without leav *557 ing issue male, although other individuals of issue male may-have been subsequently born in Frederick William’s lifetime and have been living at his death.
To see the purpose of the third contingency we must refer to the fourth. That plainly provides for the case of issue male, which Hyder may have left living at his death, dying after-wards without leaving issue male: — not a general failure of issue male subsequently, but a failure of the issue male of particular individuals left by Hyder living at his death. In that fourth contingency the pronoun Ms refers to Hyder’s issue male, as in both the second and fourth it does to Allen’s issue male. Any individual answering the description, indefinitely in the singular number, suits the expression and the intention. It is as if the testator had written, “ and should my son Hyder have a male descendant living at his death, and’ such male descendant should die without leaving issue male living at his death, then * * to the eldest male descendant of Allen * * to him his heirs and assigns forever.” The difference between the third and fourth contingencies is that the fourth, in reference to issue male had by Hyder, uses the words living at Ms death, which words are not in the third in reference to issue male had by Frederick William. These are often very potent words. Here the use of them in one place, and omission of them in another, is said to show an intention to make a distinction : upon this is based the argument of a difference made between the estates and powers of Frederick William and of Hyder ; and from that is deduced a narrow sense of issue male, in the first and second contingencies. But the same meaning may be conveyed under various expressions. Words in themselves highly significant may be superfluously used in one place, or their omission in another may be supplied by the context. If his used in the third contingency (“ and such issue male of my son Frederick William should or shall die without issue male living at the time of Ms death,”) refers not to Frederick William but to issue male, the third and fourth *558 contingencies, in relation to the two sons Frederick William and Hyder respectively, become the same in effect, notwithstanding words in one which are not in the other. Grammatical propriety requires the reference of the pronoun to the next preceding noun that is suitable; and we have seen that the testator considered issue male as suitable for this reference both before and after the third contingency. We have seen also that without this reference a long provision is useless, if the proper meaning be given to its terms: — that this uselessness, occasioned by the other reference, .can be obviated only by giving different meanings to the same terms repeated in close juxtaposition; and that this change of meaning leads to results manifestly contrary to the testator’s intention, which are saved only by inference beyond the expression, and makes the whole contingency a bungling expedient to restrict the operation of a former one. We think that the reasons for referring his to issue male rather than to Frederick William, outweigh the force of the difference made by the words “ living at his deathand that these words avail no more to make a difference of meaning between the third and fourth contingencies, than does the difference between “ to him and his heirs forever,” applied to Frederick William and Hyder, and “ to him, his heirs and assigns forever,” once applied to the male issue of Allen, avail to make a difference between the fees simple limited to all threp. But if his refers to Frederick William, the result is only that the third contingency is useless, betokening some accidental confusion in the mind of the testator. To admit this may be consistent with his expressions: but for avoiding it, to give a peculiar meaning to his terms here, and the ordinary meaning there, is taking a liberty, not authorised by any necessity which the occasion raises.
The contingencies in respect to Frederick William and Hyder being held similar, it follows that, as to each, the defeasibility of his estate was designed to continue for some time after his death. It follows further, that the answer is insufficient which, *559 from the third contingency, was hy inference given to the incredible result, of Frederick William’s estate being defeated if he left the son of a deceased son, that must come from a construction which confines the meaning of issue male as used in the first contingency, to immediate descendants. That answer is undeniably unsuitable to Hyder’s case, there being no doubt that, in the fourth contingency, Ms refers to issue male, and not to Hyder. Under the supposition that issue-male means, in the first and second contingencies, immediate descendants — sons—the contingencies as to Hyder would be, first, if he should die without a son living at his death ; second, if a son left by him should die without issue male. A son of a deceased son, living at Hyder’s death, would not prevent the defeasance, although any male descendant of a son that died after Hyder’s death would.
It has been urged that this will would be sensible, and the intention of the testator would be met, if, throughout the clause concerning the lands, son was substituted for issue male. As events have turned out, it would suit the defendant to make the substitution. But it may be remarked, that the substitution of male descendant would be equally easy, and, so far as we can perceive, equally consistent with the intention of the testator: and further, that without suitable variations, by the addition of any and every, either substitute might have produced strange results; and that, in various cases not unlikely to have occurred, son, excluding all but the first generation,'might have defeated what was probably intended. Our business, however, is not to substitute words, but to ascertain the 'meaning of those which-the testator used: and not to adapt the will to events that have occurred, but to try its meaning according to events as they might have occurred.
■We conclude that no distinction, except in the order of succession, was made between Frederick William and Hyder; that the additional contingency introduced as to Frederick William is not purposeless without altering the natural meaning *560 of its terms ; and that, whether it is or not, there is no necessity for inferring, from anything yet considered, that any peculiar meaning was given, in any part of the clause, to the terms issue male.
Third. This brings us to consider the limitations to the issue male of Allen, upon which the defendant has built much argument.
It is not our duty now to decide whether the limitations over in the third and fourth contingencies were too remote or not; nor to decide who answered the description of Allen’s issue male in the second and fourth ; nor how, in various events that may be imagined, the selection of the eldest should have been made. But we admit that the second contingency is valid, although the fourth may not be : and that explanation of the meaning of terms elsewhere used might be given in making a void limitation. And we see the necessity of inquiring into the intention of the third and fourth contingencies, if we would ascertain any reflex influence which they have upon the second, now immediately important. In considering the third and fourth, as no positive resolution will be attained upon the questions just reserved, the views of the defendant, upon every disputed point involved in them, must be taken to be correct, and their effect upon the testator’s meaning, when he used issue male in the second, be examined.
The fourth contingency is the failure of issue male of issue male left by Hyder — the death of unborn issue of unborn issue. This is too remote,' unless the limitation depending thereon is required to take effect necessarily, if at all, within the prescribed time — that is, within a life or lives in being, and twenty-one years, a child in ventre sa mere being considered a life in being. The testator was careful in both the second and fourth contingencies, when he referred to Allen’s issue, to add: “ of the sons he may have living at my death.” Who might, at the happening of the contingencies, be the eldest of those *561 sons, could not be known before the happening, and so no vested transmissible interest would have been in any of them : and thus, it is said, the limitation must have taken effect, if at all, within a life in being.
. This presupposes that the limitation was confined to a son of Allen’s living at the testator’s death. This postulate is subject to remark. According to it, the death of Allen’s described sons, all leaving sons, before Hyder’s death, would have made the i estate, once vested in Hyder, indefeasible, although Hyder may have died without any issue (a). Again, the words are not, To the eldest that may he then living of the sons that my son Allen may have living, at my death; nor are they To the eldest issue male of my son Allen then living, that is, the eldest of the sons he may have living at my death ; but they are (in the second contingency) “ to the eldest issue male of my son Allen then living, that is, of the sons he may have living at my deathand (in the fourth) “ to the eldest issue male then living of my son Allen, being of his sons living at my death;” as if (making “of” serve to show the detached points which were connected by explanation) it had been written : To the eldest issue male of my son Allen then living, that is, the eldest issue male of the sons he may have living at my death ; or, eldest issue male then living, of my son Allen, being issue male of his sons living at my death. So the limitation may have been, not to the sons, but only to their issue male, in expectation of its taking effect, if at all, at a remote period. The intention may, however, have been not to confine the devise either to Allen’s sons or to their issue male, but to extend it to both. “ Of the sons” may have been an ill-chosen mode of expressing through the sons, in the lines of the sons, or some other such phrase as would include the sons and their issue male. The testator’s remembrance of the utmost limit of the rule against perpetuities, no doubt suggested his restriction *562 of the sons of Allen to those that might be living at his own death ; and he probably thought it safe to rely upon the chance of one of Allen’s young sons being alive, when the unwished for contingency of the failures of Frederick William’s and Hyder’s issue male might happen. But in the famous will of Peter Thellusson, the period of accumulation was extended to the death of the survivor of many persons, amongst whom were “ such issue as such sons (unborn) may have, as shall he living at the time of my death” (Thellusson vs. Woodford, 4 Ves. 231); and here this testator, looking to the remote period at which his ultimate limitation was expected to take effect, if at all, and noticing the limit of time prescribed by reference to a living person, wdiose issue left at his death would necessarily be known at his death, may have used words that extend the limitation over to issue male of Allen’s sons, — in inattention to the possibility that issue male left by Iiyder, even a son of an unborn son of Hyder, might have lived more than twenty-one years after the expiration of any life in being, and yet issue male— even a son — of one of Allen’s sons be living too.
Let it however be conceded, that the ultimate'limitation was, to the person who, at the happening of the contingency, might be the eldest of the sons of Allen that were alive at the testator’s death. It is said that “ that is, of the sons,” gives the testator’s definition of issue male. On the contrary, it expressly confines the terms to a narrow sense in that place, showing an understanding that, without restriction, they would have meant more there, as they had done in other places where there was no restriction. Suppose there had been various devises to grand-children, and then one to my grand-children, the children of Allen, that is, his sons now living, could it have been inferred that, in the other devises,- the testator by grand-children meant only males. (See Dalzell vs. Welch, 2 Sim. 319.)
It has been argued, however, that, if the testator did not define the sense in which he uniformly used the terms issue male, he, by introducing words which restricted these terms to *563 some of Allen’s sons, showed his conception that, without restriction, they would have embraced sons only. He clearly showed his conception that, without restriction, all sons would have been embraced, but not that sons only would have been. It is as if he had said, By issue male I here mean sons living ; what he meant elsewhere wrnuld remain to be determined by the natural meaning of the words, if they were unexplained. By restriction -to particular sons, he excluded grandsons through daughters, — but he also excluded grandsons through sons, and excluded other sons too. The restriction gives no aid in settling the sense which he ascribed to the terms when he used them without restriction. The defendant says, of course the testator thought of issue male as coming necessarily through sons, else why did he limit to some of the sons? The answer is, he knew that issue male embraced all male descendants, and therefore, for a special purpose, he limited-the signification in one place to sons, and some only of them.
Fourth. A further attempt to deduce an explanation favorable to the defendant has been rested upon the peculiar form of the contingency, at the happening of which the ultimate limitation over was to take effect. It is the death, without issue male of issue male left by Hyder living at his death. Hyder may at his death have left a son and a daughter; the son may afterwards have died leaving a daughter, and the daughter may have died leaving a son, and yet the contingency have happened. The issue male born of Hyder’s daughter; Mrs. Bedon, after his death, could not have saved the estate from defeasance under the fourth contingency; why should such issue, born before his death, save under the second? Failure of issue male at Hyder’s death is the second; failure of issue male at a subsequent period is the fourth: ought not the same meaning of the terms to be given at both periods ? When the testator, contemplating a failure after Hyder’s death, shows that, in his opinion, it has occurred, unless there is issue male *564 descended from issue male, does he not show that the same state of circumstances at Hyder’s death would have produced the same result ? When he limits over upon issue male dying without issue male, does he not exhibit his understanding that issue male could come only through issue male ?
Under the admissions that have been made, it cannot be denied that after Hyder’s death, the' estate in fee which had been devised to him, was made defeasible, not by a general failure of his issue male, but by a more probable event, the failure of his issue male descended from the issue male that he left living at his death. His issue male is individualized, and in the fourth contingency just as he himself stood in the second. Any one of his issue male, the survivor of them if he left several, is thus indicated. A new progenitor, or stock, is spoken of: but of the new stock, (say a son of Hyder, or a grandson through a male, or a grandson-through a female,) the same issue is required that before was required of Hyder: — and unless the change of stock defines issue male to be male through males, it does not appear that a male descendant of the new stock through a female would not have answered the requisition as well in the fourth-contingency as in the second. The change of stock, an increase after Hyder’s death of the probability of defeasance, was an act within the testator’s discretion, to be understood as he expressed it, if he has given no contrary exposition of his meaning. If we indulge ourselves in speculating about'the reasons of the change — it may have proceeded from natural affection entertained by the testator for each of his sons, and a willingness after the death of one to make great the chance of the succession devolving upon another or the family *of another, rather than remaining in distant descendants of the deceased.
The case contemplated by the testator in the fourth contingency was this, — that the estate “ should have vested under the above contingencies in such issue male” — the new stock. This vesting is perhaps an indispensable condition, so that to *565 cases of sale by Hyder the defeasance under the fourth contingency could not have applied. The estate was a fee-simple— it could have vested in Hyder’s issue male only by descent from him, or by devise or other conveyance made by him. If by descent, 'there could have been no issue female, in a degree equally close to him, to share the inheritance: if by devise or conveyance, Hyder would have chosen his representative: — ■ and in either case, upon failure of the male descendants of the representatives, within the prescribed time, the testator seems to have conferred the succession upon one of Allen’s issue male, rather than, upon the female descendants of the representative, or the male descendants of Hyder born after his death. Neither any child of the representative, nor any after born male descendant of Hyder through a female, could have been nearer to the testator than a great-grand child. To such a one, succeeding to Hyder or chosen by Hyder’s act in his lifetime, the testator may have been willing to extend favor which would have been denied to him when he presented himself as a new claimant of rights that had already been once in his family defeated by failure. But all this is mere conjecture. What do the words mean ?
Under our construction the third contingency is like the fourth. The third contains nothing about vesting, except by inference drawn from the fourth. It is in effect that if Frederick William’s issue male living at his death should die without issue male, the estate shall go to Hydei or to Allen’s issue male according to events. The defendant has a right to say that as it would have been under the third, so should it be under the fourth contingency, and accordingly should be the explanation of the second. There is some more difficulty in taking a view which will save the third from the imputation of remoteness, than there was jn respect to the fourth; for the interest given to Hyder was transmissible, and the circumstance of the limitation being to him, a person in esse, was of no avail when the event might not have happened within the prescribed *566 - time.(a) Suppose however that the estate limited to Hyder, whether transmitted or not, was subject to the contingent limitation which was made to the person, who might, at the happening of the final event, be the eldest of the sons of Allen ■ that were living at the testator’s death. Suppose further that Frederick William had sold the estate, and had died leaving issue male:&emdash;that afterwards, in the lifetime of Allen’s son, such issue male of Frederick William had died, without issue male, but that other issue male of Frederick William, born after his death through females, survived&emdash;and that the fee devised to Frederick William, and sold by him, had thus been defeated. We would see that the testator had made the contingency after Frederick William’s death, different from what it was in his lifetime: in the life requiring issue male, after death requiring his issue male from particular issue male,&emdash;or, in other words, substituting the issue male after Frederick William’s death for himself in his lifetime. This would have exhibited anxiety to regulate the succession as far as possible, and to insist upon the exclusion of females. But it must be remembered, and cannot be too often called to mind in the construction of this will, that nothing was given to the issue of Frederick William or of Hyder:&emdash;that in the contingencies depending upon the existence of issue, issue male excludes females as well as issue ■ male through males would do: and that when we ask, why did the testator do this ? why did he not do that ? and, from the supposed improbability of the intention, expressed by his words, infer a peculiar meaning, we are making our conjectures'limit the range of a capricious power which a testator has in disposing of his own. The testator might have made the second contingency depend upon the failure of males through- males, or the fourth depend upon a general failure of Hyder’s male descendants: he has done neither: we must not distort his words to effect a congruity between the contingency before Hyder’s death and that 'after, when perhaps he looked to the con-' *567 gruity between Hyder and the male representative that he left.
The careful consideration which we hav¿ given to this will induces occasional suspicion that the testator had some undefined notion of an estate being limited to his sons and their issue male: — but when once we have got over this by the conclusion, which our cases will not permit us to doubt about, that he gave fees simple defeasible on contingency; and have ascertained the plain natural meaning of issue male, there is nothing in the will or in the circumstances that attended its making which shakes our confidence in adhering to that meaning.
Eirth. The numerous cases that have been cited show little more than instances of explanation given by testators to the words they used, which here we have sought in vain. Hurlbut vs. Emerson,(a) in conformity with established rule, decides that issue male when used as words of limitation, mean issue male through males. The implication there made cannot be made here.
Oddie vs. Woodford,(b) (decided by Lord Eldon after great hesitation, and expressions of distrust in his opinion, almost ludicrous,) turned at last in the House of Lords upon the term “lineal” constantly used in the phrase male lineal descendants wherever, male descendants were mentioned in Thellusson’s will; which term was useless if it did not serve to indicate the male line: and that it was so intended appeared from the testator’s having expressed the failure of estates tail male by the words “ upon failure of male lineal descendants of my said three sons.”
In Bernal vs. Bernal, (c) I have not been able to perceive the force of what the Lord Chancellor Cottenham said about the gift being in the nature of an inheritance, and about a male *568 descendant not being one of the class of male descendants although he was in the general class of descendants and was male. But I perceive that the case was decided by indications of intention appearing in clauses of a will, which provided a permanent fund, whose proceeds should be distributed as a bounty amongst collateral relations named, — “ women and their children, men and the male children of the said men.” . Children was (from the permanent nature of the fund, and the lapse of more than a century between its creation and the contest concerning the distribution of its dividends, which the case involved) necessarily construed as descendants: but if the daughter of the “ favorite nephew ” could not share the bounty in her distress, why should the son of another nephew’s daughter ? The case is said to have been in its circumstances exceedingly singular; and although the influence of either Jewish law or'Dutch law is disavowed, it is hard to divest one’s-self of the impression that Jewish customs and laws of genealogy had some weight under the testator’s reference to “the race of my father.” It is enough that there an exposition was found which controlled the natural meaning of male descendants.
We have found in the case before us nothing sufficient to establish a special sense given by the testator to the, words issue male in that part of the clause of his will, which is immediately decisive of the rights of these parties. The natural meaning must then prevail: and according to .that Hyder Ally Davie left issue male living at his death. His fee has been transmitted to the plaintiffs, and to them the postea was properly delivered.
Motion dismissed.
Dunkin, Dargan and Wardlaw, CC., and O’Neall, Glover and Murro, JJ., concurred.
Johnston, C., and Withers, and Whitner, JJ., dissented.*

Motion dismissed.

 Co. Litt. 25; 2 Jarm. on Wills. 9.

 2 Jarm. 742, and cases cited.

 1 Jarm, on Wills. 358.

 Chichester vs. Ozenden, 3 Taunt, 147.

а) 2 Jarm. 34.

 Adams vs. Chaplin, 1 Hill Ch. 280; Edwards vs. Barksdale, 2 Hill, Ch. 198; Bedon vs. Bedon, 2 Bail, 246; Buist vs. Dawes, 4 Rich. Eq. 423, 501; Mazyek vs. Vanderhorst, Bail. Eq. 48; Deas vs. Horry, 2 Hill, 246.

 1 Sull. Lect. 285.

 2 Blackst. Com. 111.

 Carr vs. Porter, 1 McC. Ch. 78; Cases supra.

 1 Jarm. 783.

 8 Rich. 309.

 16 Mass. 240.

 3 Mylne, and Craig, 627.

 3 Mylne, and Craig, 582.